Our third case this morning is 23-2027, United States v. Ruiz. And Ms. Skinner, you may proceed. Good morning. May it please the court, Amanda Skinner, on behalf of the appellant, Mr. Ruiz, I'd like to try to reserve about two minutes for rebuttal. Eyewitness identification is not the gold standard of evidence we once thought it was, and when a bad eyewitness ID comes in against the accused, it's the likelihood of misidentification that violates their right-to-do process. I'd like to start with the photo array. In this case, the district court stumbled on the first step of the Kamalahi analysis by finding that, quote, the array leans towards not being impermissibly suggestive, and then concluding that Mr. Ruiz's photo does not jump out as strikingly different from the other photos. This finding is clearly erroneous just on a review of the photographs, and you can contrast this array with the arrays that were described in Kamaheli, Wirku, and Weissman. For example, in the Kamalahi case, the court found that each photograph depicted a man of medium complexion, medium build, no visible piercings, and most had little, if any, facial hair. No one had any distinctive facial features or other identifying marks. And in Wirku, this court found that all of the photos were a photograph of an Ethiopian man, and they were all of similar ages. If we spot you on an unnecessarily suggestive procedure, could you address how you satisfy the reliability component of the analysis? Yes, thank you. The reliability needs to be analyzed in the context of the suggestibility. We have six photos here. That number in and of itself should have made the district court weigh those irregularities heavily, which there's no evidence in the record that the district court really even weighed them at all. And so when we get to reliability and look at the vigorous factors, it's also clear that this pre-court identification should have been suppressed. In the district court's order, the district court does discuss the factors, and I'll just start going through them. I understand there may be questions. The opportunity to view of the government informant to view the individual. Three meetings. First, less than a minute. Second, maybe ten minutes. But it's at the time of the crime, right? View at the time of the crime? Yes, and I'm talking about the short duration. Two of the three meetings were less than a minute. So we're talking about 12 minutes in total that this government informant had an opportunity to view the individual. Then his degree of attention, and this is critical because I think that the, or we would argue that the bad lineup in this case is a result of a bad list of features or an incomplete list that the government informant was able to give. He could not give any description of height, weight, body type, skin color, facial hair, other distinguishing characteristics like someone's nose or ears. He essentially described everyone's grandfather in southern New Mexico and said an older Hispanic male in a cowboy style shirt with mostly gray hair. There's just nothing unique there. And so I think that goes to his degree of attention, that he literally could not pull out whether this person had any facial hair. And then the accuracy of his prior description and the level of certainty demonstrated at the confrontation. He needed a second photo. This is not an ID off of a six-photo array, a bad six-photo array even. This is an ID based on a one-person show-up of a second photo. When the witness asked to see a lightened photo of photo number five, instead of lightening that photo and providing it to him, the agent picked out a second photograph, clearly taken on the same day because he's in the same outfit, but the mask has been removed. It's a different angle, different lighting, and that could have demonstrated to the government informant, this is our guy. I have this photo at the ready. It's a separate photo. It's not even the first one I showed you because this is the person. And then the time between the crime and the confrontation, 16 months. In Wercou, that was a 30-year difference, and this court said that that was fine in light of the circumstances in that case. Those individuals saw the accused in that case almost every day for months. Four of them had been tortured by the individual in that case, and so this court found that even with a long delay, that was sufficiently reliable. In Biggers, there was a delay of about seven months, which the courts still said could be problematic. The seven months is a long time, but the victim in that case gave an extremely detailed description of her attacker, and she was able to give approximate age, height, weight, complexion, skin texture, build, voice, and she said she had no doubt that the defendant was the person who had assaulted her, and she had made no previous identifications at any show-ups, line-ups, or photographic showings that she had gone to, and she had gone to many. And in this case, we have this delay and an inability of the government informant to come up with any distinguishing characteristics, so I think that that goes to the issue of— Is it a clear error standard of review for the reliability problem? Yes, clearly erroneous applies with respect to the trial court's findings, and the trial court found under the totality that this was not unreliable. Did you make an argument in the district court on the certainty factor under Biggers, that it was—you know, you're arguing that Mr. Weber was not immediately certain since he asked for a lighter photo, and the district court found that he was certain. Did you challenge that as a clear error review for that? Yes, I believe that at the suppression hearing, the testimony was given that he needed the second photo. I believe trial counsel cross-examined on that, but I don't believe that it was specifically argued or addressed in the district court's order. In terms of the number of photographs, sort of getting back to the first issue, whether it was impermissibly suggestive, that's an important finding, I guess, regardless of this court's ultimate decision on the case, because it's important to know what passes muster for a photo array. We don't want to fall into a situation where law enforcement is routinely providing unduly suggestive photo arrays, but the district court then has to do the work to determine, under the totality of the circumstances, is this reliable? This photo array, it's a paltry number six. This court has said it time and time again, six is not what we're after. It's too small, and for the district court, while it's not a substantive factor, for the district court then to look at every obvious and glaring irregularity and not give it any weight is where that analysis stumbles. These individuals do not appear similar in not even taking into account the individuals in the photographs. The actual photographs themselves are not all of the same size and lighting, and critically, number five, Mr. Ruiz, his is the only photograph that has traditional mugshot lines behind it, and the only photograph where he's wearing a mask. This identification or this arrest took place during COVID. This identification from the government witness took place during the COVID pandemic, and that mask is such an obvious suggestion of recency, and when you take it in connection with the second photograph, clearly the same day, the government witness could not help but know that this person has just been arrested. No one else is in a mask. The district court made a finding that all individuals in the array were, quote, apparently Hispanic. Even the district court doesn't seem sure how this grouping is cohesive. The point of a photo array is to see if a witness, especially a government informant highly motivated to lie after his second drug-related arrest in two months, can pick a suspect out of a group of similar individuals. The agent testified his procedure was to try to put individuals together that looked similar, and he could only give three characteristics that he looked for when putting together a lineup. Age, which I would submit he missed based on a review of the photographs, skin coloring, which I would submit he missed based on a review of the photograph, and facial expression. Arguably, the majority of the individuals in the photos have what could be similar facial expressions. Beyond that, there's no unifying characteristic in these photos, and I would also note that the agent testified at the suppression hearing that someone else put the photographs together for him. An analyst pulled these items, and in many of the cases that we cite in our brief, there's testimony in the record that the actual agent who did the show-up or the lineup was the one who was also putting together the array for the witness. If you don't have additional questions, I'd like to reserve. I have one more. Yes. How should we be thinking about your contention that Mr. Weaver was not a disinterested witness because he was cooperating or something along those lines, right, and that that makes the identification unreliable? His prior convictions makes the identification unreliable. Should we be thinking about that at all? Yes. I think that it goes to the second prong, to the reliability, his degree of attention, the level of certainty demonstrated at the confrontation. The fact that he had prior convictions? Oh, I'm sorry. Mr. Weaver's the government informant? The informant. The informant, yes. Yes. We would submit that he was not certain of this identification, but when he saw that second photograph, that was a telegraph to him. This is who you need to pick. He was waiting on the District of New Mexico to potentially give a statement on his behalf for his pending case in another jurisdiction. He needed to make this ID. There is evidence in the record that he testified that he was not a drug dealer prior to the COVID-19 pandemic. He fell into this very quickly, somehow got to the point where he was trafficking enormous quantities, and when he was arrested the first time in September, said, I can give you information, and gave a very generic, nonspecific description of an individual, but did have one specific feature, some sort of chemical burn on the person's arm. Only specific information he could give, and the agent chose not to use that in the photo array. You can give a photo array of whatever you want. Someone's belt buckle could be at issue. Someone could have a smaller arm. You can make a photo array of individuals. You can even add. Courts have found that you can superimpose markings on people's skin in the photograph to see if they can be identified. And so I think it goes to his credibility, which, of course, we acknowledge. Trial counsel had an opportunity to cross-examine on this issue, but it should have weighed more heavily for the district court that you have a two-time arrestee pending sentencing who really couldn't give any specifics about this individual. May it please the court. My name is Joni Stahl, and I'm an AUSA in Las Cruces, New Mexico. Because there was no clear error in the district court's factual findings in this case about the credibility or the contents of the photo array or its presentation to Weaver, this court should affirm the district court's determination that was properly given to the cooperator, that the cooperator was reliable, and that it was proper to allow that in-court identification. Counsel, how do you address your friend's argument that there seems to be something really wrong with Weaver asking to see a lightened photo and, in response, getting a different photo, another photo? Why is that OK? How should we be thinking about it? Well, I think it's important to go back to the record. So Agent Vargas from HSI was a special agent who testified at the suppression hearing. He, on direct, testified that Weaver immediately focused on number five and asked to see a lighter picture. And then on cross-examination, testified that Weaver was, I can't remember the exact word, but that he was hyper-focused on that picture number five before he asked to see the second picture, that he just asked to see a lighter photo. And I would also submit that this court can rely on Weaver's testimony at trial, where he indicated that he was confident in the identification that Ruiz, number five, was the person who had supplied him before he asked for the picture. Do you contend that that's a preferred practice, to provide an additional photo? No, Your Honor, absolutely not. So it probably is not the best way to proceed, right? Correct. I agree with the court. And so in this case, you're saying even though probably what should have happened is he, Agent Vargas should have just lightened the photo, not provided another one. How are we supposed to be thinking about that and affirming? Your Honor, even if the court determines that the district court erred and that the array was itself impermissibly suggestive, the court can still affirm on reliability because there's really no issues as to the reliability of this. Doesn't the same problem go to the certainty factor in Biggers? I don't think so. Why not? Because in this case, you have a cooperator who gave a description of the person who provided him with methamphetamine on three separate occasions, starting back in September of 2020, again in December of 2020, and then again when he did the photo array, before he was shown any pictures. He gave this description of an older Hispanic gentleman. And I would submit that he actually gave a description of a 50-ish-year-old man, so not just an older gentleman, but specifically in his 50s, gave a description of his attire, which doesn't show up in the initial photo array. He gave a description of a skin condition that's very specific to Mr. Ruiz that didn't show up in the photo array. And contrary to Ms. Skinner's argument, I would say that helps the government in this because if we had shown an array that showed arms and hands and one of those individuals had this skin condition, that would be certainly suggestive. So you have all of these other factors. And then you also have Mr. Weaver describing the manner of the delivery of the drugs in a spare tire that this individual was known to him as the tire man or the yonta man. And so all of these things go to Mr. Weaver's credibility and the fact that when Mr. Ruiz was arrested, he fit this description. It wasn't just an older Hispanic gentleman. It was an older Hispanic gentleman with all of these other caveats that were present with Mr. Weaver. I'm excuse me, present with Mr. Ruiz. Then the mug shot component of this with the background, that kind of jumps out at us. The informant probably knew that Ruiz had been arrested before. This kind of leads down that path that, oh, if he's arrested, he must have done something wrong. I think in this case, Your Honor, the district court properly considered that and noted that the lines in the background are distinctive. That's probably the most distinctive. The district court actually identified the darkness of the photograph, the mask, and the lines, but the judge kind of focused on these lines in the background. But the court found that factually all of these pictures look like mug shots and that the lines didn't immediately make the picture jump out. But to Your Honor's point, even if this court disagrees with the district court, the reliability of the witness's identification would still save the overall identification. Moving on to, do you concede that the year and a half between Weaver's last interaction with Ruiz weighs against reliability? I would not in this case, Your Honor. Didn't you concede that in your briefing? You did not? No. Okay. Just based on the fact that there were multiple identifications where Mr. Weaver gave very consistent descriptions of the person who supplied him with methamphetamine, and those were kind of over this period of time. So while the photo array was later, the description had been given a number of times and had remained consistent, and then he was shown the photo array. So just kind of honing in on the factors for reliability, the district court noted that Mr. Weaver had met with Mr. Ruiz on three occasions. Ms. Skinner knows that we're talking about maybe a total of 12 minutes, but I would note that we're talking about three times in broad daylight under circumstances when they're in very close contact because they're close enough to hand each other these drugs. We would also argue that the fact that he gave these other descriptive factors based on the observation of how the drugs were delivered, the spare tire, the description of Mr. Ruiz's vehicle, all of those things go to his opportunity to observe his degree of attention. And then I just would highlight for the court kind of the linchpin of the government's case here is the accuracy of that prior description when Mr. Ruiz was finally arrested, and he did fit every single one of those characteristics, the skin pigmentation being the most critical. So I don't really need to get to harmless error unless the court has specific questions for that. I think that the reliability is the real winner here for the government. But if the court were to determine that the district court erred in finding the identification reliable in this instance, we would argue that in light of the abundance of other evidence that kind of cut against Mr. Ruiz's defense in this case, the government would still be able to establish that the error was harmless based on all the other things that came into trial about Mr. Ruiz's defense, specifically the testimony that Mr. Ruiz crossed a number of times in a number of vehicles and he was unable to explain those crossings, how his border crossings on at least one occasion matched up with a meeting with Mr. Weaver, how he reacted when he was caught, how he stayed calm, which corroborated Mr. Weaver's testimony, but also kind of cut against this blind mule defense where the average person, if told they have drugs in a car and that they don't know about, would not react in a calm, kind of relaxed manner. All of that testimony that came in at trial. I don't have anything further unless the court has specific questions. Judge Baldock? No. Thank you, counsel. Thank you. We have some rebuttal time. Thank you. I just want to touch briefly on harmless error. You know, regardless of how you act when you're stopped at a checkpoint under these circumstances, it's a problem. If you're yelling and screaming, you doth protest too much. If you're calm, it's also suspicious. This case is unique and distinguishable from Robertson, which the government cites in their brief. Mr. Ruiz maintains his innocence. He maintained his innocence throughout the case. His defense was that of a blind courier. There's no admission from him. And importantly, there's no corroborating information in the form of text messages, information on his phone. There was some discussion at the trial as to why the government wasn't able to get that information, but there was nothing. And so because of the defense in this case, this was not harmless error. It went to the absolute heart. And the photo array was a problem because Mr. Weaver could not give enough descriptions, not only to identify who the tire man was, but to allow law enforcement to put together a usable, constitutionally permissible array. Thank you. Thank you, Counsel. Counsel, our excuse in the case is submitted.